UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | |
|---|---|
| **JOSE LUIS LOMELI VENEGAS ET AL** | **CASE NO.  3:21-CV-03269 LEAD** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **AMAZON.COM INC ET AL** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

MEMORANDUM RULING

Pending before the Court is a Motion for Summary Judgment [Doc. No. 286] filed by Defendant, Artisans & Truckers Casualty Co. ("Artisan"). Plaintiff, Edith Gonzales ("Gonzales"), opposes the Motion [Doc. No. 319].

For the following reasons, Artisan's Motion is **GRANTED**.

I.   Background

On October 16, 2020, Edmund Miller ("Miller"), Jose Venegas ("Venegas"), and Lorinzer Walker ("Walker") drove their vehicles down Interstate 20 in Madison Parish, Louisiana.[1] Behind them, Dilshod Abdurasulov ("Abdurasulov") drove a 2019 Volvo Tractor, owned by MJS Enterprise, Inc. ("MJS"), that hauled a 2020 HYTR Trailer (jointly, the "Rig"), owned by Amazon.com or Amazon Logistics ("Amazon").[2]

Miller, Venegas, and Walker slowed down due to traffic congestion.[3] Abdurasulov, however, allegedly did not slow down.[4] Consequently, the Rig rammed

---

[1] [Doc. No. 86, at ¶ 5]; [Doc. No. 94, at ¶ C-1]; [Doc. No. 101, at ¶ 3].
[2] [Doc. No. 94, at ¶ C-3].
[3] [Id. at ¶ C-4]; [Doc. No. 86, at ¶ 5]; [Doc. No. 101, at ¶ 5].
[4] [Doc. No. 94, at ¶ C-5].

Venegas' car, thrusting it onto the left eastbound lane where it collided with another eighteen-wheeler, thereby killing Venegas.[5] After colliding with Venegas' car, the Rig rear-ended Miller's car and rammed it into the back of Walker's truck.[6] Miller's collision was also fatal.[7] Walker, fortunately, survived, but not without injuries.[8]

Alion Logistics, Inc., ("Alion") initially accepted the job to haul Amazon's Trailer.[9] Alion, however, had insufficient trucks, so their dispatcher re-assigned the gig to MJS and Abdurasulov.[10] National Continental Insurance Company is MJS' insurer, and Artisan issued Alion's insurance policy (the "Policy").[11]

Individual suits were filed on behalf of Miller, Venegas, and Walker in the Sixth Judicial District Court in Madison Parish, Louisiana.[12] Amazon removed the cases to this Court, citing diversity jurisdiction.[13] The Court consolidated the cases.[14]

There are two overarching issues in this Motion: (1) whether the Policy, on its own, covers the accident; and (2) alternatively, whether the MCS-90 provides coverage. The parties briefed all relevant issues, and the matter is ripe for ruling.

---

[5] [Id. at ¶¶ C-8, C-12].
[6] [Id. at ¶ C-10].
[7] [Doc. No. 86, at ¶ 11].
[8] [Doc. No. 101, at ¶ 7].
[9] [Doc. No. 314-6, at pp. 64–65].
[10] [Id. at pp. 65–66].
[11] [Doc. No. 94, at ¶¶ I-1–I-2].
[12] [Doc. No 1-2].
[13] [Doc. No. 1].
[14] [Doc. No. 49]. The other plaintiffs' suits have since settled [Doc. Nos. 344; 349].

## II. Law and Analysis

### A. Standard of Review

A court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). If the movant meets their initial burden of showing no genuine issue of material fact, "the burden shifts to the nonmoving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013) (citation modified). A fact is "material" when proof of its existence or nonexistence would affect the lawsuit's outcome under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, "the mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgement." *Id.* at 247–48. And a dispute about a material fact is "genuine" only if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

While courts will "resolve factual controversies in favor of the nonmoving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). But summary judgment is appropriate when the evidence is "merely colorable or is not significantly probative." *Anderson*, 477 U.S. at 249 (1986) (citation modified).

Moreover, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citation modified).

Courts "may not make credibility determinations or weigh the evidence" and "must resolve all ambiguities and draw all permissible inferences in favor of the non-moving party." *Total E & P USA Inc. v. Kerr–McGee Oil and Gas Corp.*, 719 F.3d 424, 434 (5th Cir. 2013) (citations omitted).

Finally—and importantly—there can be no genuine dispute as to a material fact when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof of trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Under Louisiana law, which applies in this diversity suit, interpreting insurance policies is a legal question. *See Bayou Steel Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 642 F.3d 506, 509–10 (5th Cir. 2011) (citations omitted). When construing insurance policies, Louisiana courts apply the Louisiana Civil Code's general rules for interpreting contracts. *Id.* (collecting cases). A policy's words and phrases are given their plain, ordinary, and generally prevailing meanings, unless they have acquired a technical meaning. *Id.* at 510 (citing LA. CIV. CODE ANN. art. 2047 (2025)). Only if a policy's words are ambiguous or lead to absurd consequences, may courts seek to determine the common intent of contracting parties. *Id.* (citing LA. CIV. CODE ANN. arts. 2045–46 (2025)). Finally, exclusionary provisions in a policy are "strictly construed against the insurer." *Id.* (quoting *Calogero v. Safeway Ins. Co. of La.*, 753 So. 2d 170 (La. 2000)).

### B. Coverage Under the Policy

The Policy states that:

> [I]f [Alion] pay[s] the premium for liability coverage for the *insured auto* involved, [Artisan] will pay damages . . . for which an *insured* becomes legally responsible because of an accident arising out of the ownership, maintenance, or use of that *insured auto*.[15]

Thus, for Artisan to provide accident coverage, (1) the accident must involve an insured auto and (2) an insured must be legally responsible for the accident.

### 1. Insured Auto

The Policy provides four definitions for insured autos. First, vehicles that are listed on the general declarations page.[16] Second, Additional Autos, i.e., vehicles Alion acquires during the policy period about which Artisan is informed within thirty days of the vehicle's acquisition.[17] Third, Replacement Autos, i.e., vehicles Alion acquires to replace a vehicle that is on the general declarations page.[18] Fourth, Temporary Substitute Autos, i.e., "any auto [Alion does] not own while used with the permission of its owner as a temporary substitute for an insured auto[.]"[19]

It is undisputed that the Rig was not on the Policy's declarations page,[20] nor an Additional or Replacement Auto as Alion never acquired the Tractor or the Trailer.[21] Gonzales, however, contends that the Rig qualifies as a Temporary Substitute Auto. Specifically, they point to (1) emails suggesting MJS "took" the load because Alion's vehicle needed repair,[22] (2) Abdurasulov using Alion's load ID codes,[23]

---

[15] [Doc. No. 286-3, at p. 18 (emphasis added)].
[16] [Id. at p. 14].
[17] [Id.].
[18] [Id. at p. 15].
[19] [Id. at p. 17].
[20] [Id. at pp. 5–6].
[21] [Doc. No. 286-5, at p. 11].
[22] [Doc. No. 314-7, at p. 102]; [Doc. No. 314-16, at p. 1].
[23] [Doc. No. 314, at p. 16].

(3) Alion's contract with Amazon prohibiting subcontracting gigs,[24] and that Alion's actions with MJS qualify as a "lease" under a federal regulation.[25]

Artisan rebuts Gonzales' arguments. Artisan argues that the Rig does not qualify as a Temporary Substitute Auto because it was neither in Alion's possession or control, nor driven by an Alion driver at the time of the accident.[26] They point to (1) Alion's testimony that Alion never employed Abdurasulov,[27] (2) Abdurasulov's testimony that he never worked, under contract, for Alion,[28] and (3) MJS' testimony that they employed Abdurasulov at the time of the accident.[29]

Under both the Policy and the federal regulation that Gonzales cites, 49 C.F.R. § 376.2, the word "use" does the heavy lifting. So, the key inquiry is whether Alion "used" the Rig when they transferred the load to MJS. The holding in *Lietz v. Wentzell* is instructive. 461 So. 2d 473 (La. Ct. App. 1984). In *Lietz*, the offending driver operated his friend's car. *Id.* at 474. The plaintiffs also sued the insurer and driver's wife, as the policy was in her name. *Id.* The plaintiffs argued that the friend's car qualified as a temporary substitute automobile under the wife's policy. *Id.* at 475. The *Leitz* court was unconvinced and held that the friend's car was not a temporary substitute automobile under that policy since the wife did not control or possess the car when it crashed. *Id.*

---

[24] [Id. at p. 10].
[25] [Doc. No. 319, at p. 16].
[26] [Doc. No. 286-1, at p. 13].
[27] [Doc. No. 286-4, at p. 11].
[28] [Doc. No. 286-6, at p. 14].
[29] [Doc. No. 286-5, at p. 15].

*Leitz*'s analysis appears sound and persuasive. If "use" was not imputed in a marital relationship, it goes without saying that use will not be imputed under this case's facts. Alion neither possessed nor controlled the Rig at the time of the accident. Alion did not possess the Rig as they did not buy or lease it.[30] Alion did not have control over the Rig because they had no control over Abdurasulov—an MJS employee.[31] If, for example, Abdurasulov's drive was abnormally long, Alion had no authority to punish him. True, Abdurasulov used Alion's ID codes,[32] but that alone is not dispositive. Under these facts, Alion had no control over Abdurasulov or the Rig.

Thus, the Rig does not qualify as a Temporary Substitute Auto. Consequently, the Rig is not an insured auto under the Policy.

### 2. Insured

The Policy provides two definitions for an "insured." First, Alion is an insured "with respect to an insured auto."[33] Second, anyone using, "with [Alion's] permission and within the scope of that permission, an insured auto that [Alion] own[s], hire[s], or borrow[s]" is also an insured.[34] The second provision, however, exempts anyone "from whom the insured auto is leased, hired, or borrowed unless the insured auto is a trailer connected to a power unit that is an insured auto [or] the insured auto is specifically described on the declarations page."[35] The Z433 IL (04/08) Endorsement

---

[30] [Id. at p. 11]; [Doc. No. 286-3, at pp. 5–6].
[31] [Doc. No. 286-4, at p. 11]; [Doc. No. 286-6, at p. 14]; [Doc. No. 286-5, at p. 15].
[32] [Doc. No. 314, at p. 16].
[33] [Doc. No. 286-3, at p. 18].
[34] [Id.].
[35] [Id.].

Page **7** of **10**

to the Policy also added "volunteer workers" as insureds, "but only while performing duties related to the conduct of [Alion's] business."[36]

Artisan argues that the second provision is not triggered because MJS and Abdurasulov had "possession, custody, [and] control" of the Rig.[37] Gonzales argues Abdurasulov is a volunteer worker as Abdurasulov was not employed by Alion and volunteer workers did not need to be "operating an 'insured' vehicle."[38]

As stated above, the Policy needs both (1) an accident involving an insured auto and (2) an insured who is legally responsible for the accident. Since the Court finds the Rig was not an insured auto, whether Abdurasulov or MJS were insureds has no effect on policy coverage. "If it is not necessary to decide more [to dispose of a case, then] it is necessary not to decide more." *PDK Labs., Inc. v. United States DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in judgment). Therefore, the Court will not address these arguments.

Accordingly, the Court finds that there is no genuine dispute of material fact about whether the Policy's coverage is triggered—it has not.

### C. The MCS-90

The Policy also contains a federally mandated MCS-90, which states that:

> In consideration of the premium stated in the policy to which this endorsement is attached, [Artisan] agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier

---

[36] [Id. at pp. 97, 75].
[37] [Doc. No. 286-1, at p. 16].
[38] [Doc. No. 319, at p. 10].

> Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere.[39]

Gonzales argues that if the Policy itself does not apply, then the MCS-90 provides coverage because the MCS-90 does not require that the Policy cover the Rig.[40] Artisan counters that (1) the MCS-90 also does not apply since MJS—not Alion—hauled the Rig in interstate commerce and (2) even if the MCS-90 applies, it does not preclude summary judgment.[41] The Court addresses each argument in turn.

*First*, Artisan is mistaken that the MCS-90 is not triggered. *Cutrer v. TWT Transp., L.L.C.* summarized the Fifth Circuit's test for MCS-90 applicability: "at the time of the accident," was the insured being paid "to transport the property of a third party in interstate commerce." 485 F. Supp. 3d 677, 685 (M.D. La. 2020). Here, the answer is undoubtedly yes. Alion accepted Amazon's contract to haul the Trailer and would be paid by Amazon when they completed the haul.[42] Thus, Alion was being paid to transport a third-party (Amazon's) property in interstate commerce. And therefore, the MCS-90 applies.

*Second*, the Court, however, agrees with Artisan that even though the MCS-90 applies, it does not preclude summary judgment. The Fifth Circuit described the MCS-90 as creating "a suretyship, which obligates an insurer to pay certain judgments against the insured arising from interstate commerce activities, even

---

[39] [Doc. No. 286-3, at p. 9].
[40] [Doc. No. 314, at p. 18].
[41] [Doc. No. 286-1, at p. 16]; [Doc. No. 327, at p. 8].
[42] [Doc. No. 314-6, at pp. 65, 73–74].

though the insurance contract would have otherwise excluded coverage." *Canal Ins. Co. v. Coleman*, 625 F.3d 244, 247 (5th Cir. 2010). In other words, the MCS-90 makes the insurer liable for judgments secured against the insured if and when the insured is found liable. It does not create or expand a preexisting policy's coverage. Thus, the MCS-90 does not bar summary judgment if an underlying policy provides no coverage.

To sum, the Court concludes that the Policy does not provide coverage for the accident. And although the MCS-90 applies, it does not preclude summary judgment.

### III. Conclusion

For the reasons stated above,

**IT IS ORDERED, ADJUDGED, AND DECREED** that Artisan's Motion for Summary Judgment [Doc. No. 286] is **GRANTED** and Gonzales' claims against Artisan are **DISMISSED WITH PREJUDICE**.

MONROE, LOUISIANA, this 24th day of November 2025.

_____
TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE